Estado Libre Asociado de Puerto Rico
**TRIBUNAL DE APELACIONES**
**PANEL IX**

| | | |
|---|---|---|
| Viviane Cósimi Ancher Margarite Cósimi Ancher<br><br>Apelante<br><br>vs.<br><br>Undare, Inc.<br><br>Apelada | KLAN202201002 | **APELACIÓN** procedente del Tribunal de Primera Instancia, Sala de San Juan<br><br>Civil Núm.: SJ2020CV01458<br><br>Sobre: Daños y Perjuicios Cobro de Dinero – Ordinario |

Panel integrado por su presidente, el Juez Rivera Colón, la Juez Lebrón Nieves y el Juez Rodríguez Flores.

Rivera Colón, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 31 de enero de 2023.

Comparece ante nos, las señoras Viviane Cósimi Ancher (Sra. Viviane Cósimi) y Margarite Cósimi Ancher (Sra. Margarite Cósimi) (en conjunto, parte apelante) quienes presentan recurso de "Apelación" en el que solicita la revocación de la "Sentencia" dictada el 30 de septiembre de 2022,[1] por el Tribunal de Primera Instancia, Sala Superior de San Juan. Mediante el referido dictamen, el foro primario declaró Ha Lugar la "Moción para que se Dicte Sentencia Sumaria" y la Reconvención, ambas presentadas por UNDARE, Inc. (UNDARE o parte apelada).

Examinada la solicitud de autos, la totalidad del expediente y el estado de derecho aplicable ante nuestra consideración, modificamos el dictamen mediante los fundamentos que expondremos a continuación.

---

[1] Notificada el 4 de octubre de 2022.

**I.**

El 18 de febrero de 2020, la parte apelante presentó una "Demanda" por cobro de dinero contra UNDARE. En síntesis, alegó que, tras el fallecimiento de su padre, ambas hermanas heredaron una propiedad ubicada en la Calle Petunia 1912 de la Urb. Santa María, Río Piedras, Puerto Rico. Aducen que, para la fecha del 15 de noviembre de 1995, representantes de UNDARE visitaron la propiedad antes descrita, y les solicitaron que suscribieran un documento intitulado "Certificado de Aceptación/Adopción", el cual disponía "[q]ue no tengo objeción a que se implante el control de acceso, según se establece en dicho dictamen, accediendo a que se dicte Resolución Final a este respecto" (énfasis en el original). Afirmaron que, aunque inicialmente la Sra. Viviane Cósimi se negó a firmar el referido documento, ésta lo suscribió después de que uno de los representantes de UNDARE le informara que dicho documento no era para acogerse al control de acceso, sino para consignar que no se oponía al mismo.

No obstante lo anterior, la parte apelante sostiene que, a partir del 15 de noviembre de 1995, UNDARE comenzó a exigirles el pago de las cuotas de mantenimiento. Señaló que, ante la negativa de emitir los pagos requeridos, ha sido coaccionada al pago de una cuota que se le ha cobrado de manera ilegal e injustificada. Por consiguiente, solicitó la restitución de $13,342.80, cantidad que le fue pagada a la parte peticionaria en concepto de cuotas de mantenimiento. La parte apelante argumentó que, dicha cantidad se pagó sin el previo consentimiento del titular registral de la propiedad para aceptar la implantación del control de acceso. Así, arguyó que, nunca se obligó a pagar las cuotas de mantenimiento, y UNDARE tampoco ha tenido derecho alguno como acreedor para reclamar el pago de

dichas cuotas. En fin, apuntó que la deuda reclamada surge de un cuasicontrato de cobro de lo indebido.

Posteriormente, el 1 de julio de 2020, la parte apelante presentó una "Demanda Enmendada" en la cual reiteró sus alegaciones y, en lo pertinente, señaló que, como el inmueble estaba inscrito a favor de varias personas,[2] el consentimiento de la Sra. Viviane Cósimi al pago de las cuotas requería de un acuerdo mayoritario. Así, adujo que, como esta última era dueña de una cuarta (1/4) parte de la comunidad de bienes, su firma en el "Certificado de Adopción/Aceptación" no es representativa y, en consecuencia, no obliga a los demás codueños de la cosa a aceptar el control de acceso. Asimismo, y de conformidad con el principio de publicidad registral, la parte apelante alegó que, UNDARE no ignoraba el hecho de que la Sra. Viviane Cósimi no era la única dueña de la propiedad. Adicionalmente, expuso que, el "Certificado de Aceptación/Adopción" no cumple con lo requerido por la Ley Núm. 21 del 20 de mayo de 1987, 23 LPRA sec. 64, *et seq.*, mejor conocida como la "Ley de Control de Acceso", según enmendada. Argumentó que, el precitado estatuto requiere que las autorizaciones para solicitar el permiso de control de acceso se hagan de forma expresa,[3] requisito que no surge del "Certificado de Aceptación/Adopción". Por último, la parte apelante sostuvo que, UNDARE estaba cometiendo actos ilegales al privarles de ciertos derechos adquiridos al amparo de la Ley Núm. 121-2019, 8 LPRA sec. 1511 *et seq.,* también conocida como la "Carta de Derechos y la Política Pública del Gobierno a Favor de los Adultos Mayores", según enmendada.

---

[2] La parte apelante arguyó que la propiedad estaba inscrita en favor de la Sra. Viviane Cósimi, la Sra. Margarite Cósimi y la señora Marguerite Louise Ancher (esposa del fenecido padre de las hermanas Cósimi). Ambas hermanas compartían el 50% de la titularidad del inmueble, mientras que la esposa poseía el otro 50% de esta.
[3] Véase 23 LPRA sec. 64(a)(c).

En respuesta, el 9 de octubre de 2020, UNDARE presentó una "Contestación a Demanda y Reconvención" en la cual, entre otras cosas, alegó que hubo consentimiento válido por parte de los comuneros para someter el inmueble al control de acceso. Además, indicó que, el "Certificado de Adopción/Aceptación" fue evaluado por el Municipio de San Juan, entidad que determinó que dicho documento cumple con la ley. Por su parte, reclamó la cantidad de $34,508.53 por concepto de cuotas de mantenimiento y sistema de control de acceso. El 21 de octubre de 2020, la parte apelante presentó su "Réplica a Reconvención" y, en esencia, adujo que, la obligación reclamada es inexistente, puesto que entre ambas partes no se constituyó la obligación que surge de la Ley Núm. 21, *infra.*

Tras varios trámites procesales, el 30 de noviembre de 2021, UNDARE presentó una "Moción para que se Dicte Sentencia Sumaria" y, en lo pertinente, argumentó que la Sra. Viviane Cósimi estaba obligada a pagar las cuotas de mantenimiento, pues autorizó el control de acceso al firmar el "Certificado de Aceptación/Adopción". Asimismo, indicó que, la Sra. Margarite Cósimi estaba igualmente obligada al pago de las cuotas de mantenimiento porque, aunque ella no lo firmó, su hermana estaba autorizada por todas las propietarias del inmueble a suscribir el aludido certificado. Adicionalmente, sostuvo que, la reclamación estaba prescrita, ya que la "Demanda" se presentó el 18 de febrero de 2020, y la parte recurrida tenía hasta el 15 de septiembre de 1999 para impugnar el "Certificado de Aceptación/Adopción" por vicios del consentimiento.[4] Además, adujo que, el foro primario carecía de jurisdicción para atender el

---

[4] El Art. 1253 del Código Civil de 1930, 31 LPRA sec. 3512, disponía que, en los casos de error, dolo o falsedad de la causa, la acción de nulidad prescribirá a los cuatro (4) años.

planteamiento, a los efectos de que el contenido del "Certificado de Aceptación/Adopción" no cumple con la Ley Núm. 21, *infra.*

Posteriormente, el 21 de diciembre de 2021, la parte apelante presentó una "Segunda Demanda Enmendada" y alegó que, para el 15 de noviembre de 1995, fecha en que la Sra. Viviane Cósimi firmó el "Certificado de Aceptación/Adopción", UNDARE no contaba con el endoso del propietario de la Petunia 1912 a la Solicitud de Autorización, el cual es requerido por ley.[5]

Así las cosas, el 7 de febrero de 2022, la parte apelante presentó su "Moción Solicitando Sentencia Sumaria Parcial a Favor de las Demandantes y en Oposición a Moción de Sentencia Sumaria de la Parte Demandada". En lo pertinente, argumentó que, la Sra. Viviane Cósimi nunca estuvo obligada a pagar las cuotas de mantenimiento, ya que el "Certificado de Aceptación/Adopción" firmado por ésta es un endoso a un Dictamen Preliminar, el cual no obliga al pago de la cuota de mantenimiento.[6] Por su parte, señaló que la "Demanda" no estaba prescrita, puesto que el referido endoso no constituye un contrato. Por último, recalcó que, como el "Certificado de Aceptación/Adopción" es un endoso y no una solicitud de autorización, el foro *a quo* posee jurisdicción para determinar si éste cumple o no con lo requerido por la Ley Núm. 21, *infra.*

Por otro lado, el 10 de marzo de 2022, UNDARE presentó su "Oposición a la Solicitud de Sentencia Sumaria de la Parte Demandante Contenida en la Entrada 111 del Expediente de

---

[5] A esos efectos, sostuvo que, UNDARE preparó una solicitud de autorización para el cierre de las calles de las urbanizaciones (Primera Solicitud de Autorización), de acuerdo con las disposiciones de la Ley Núm. 21, *infra.* Indicó que, para la radicación de la Primera Solicitud de Autorización ante el Municipio de San Juan, era condición indispensable que la solicitud de autorización fuese adoptada por tres cuartas (3/4) partes de los propietarios de las viviendas allí establecidas. Sin embargo, apuntó que la Primera Solicitud de Autorización preparada por UNDARE fue endosada por la Sra. Viviane Cósimi y su esposo, el señor Jaime Fortuño. Sin embargo, alegó que este último no era propietario de la Petunia 1912. Por ende, aduce que no se cumplió con el criterio de las tres cuartas (3/4) partes, ya que la Sra. Viviane Cósimi era dueña de una cuarta (1/4) parte de la propiedad.

[6] Véase 23 LPRA sec. 64a (c).

SUMAC" y, en esencia, sostuvo la improcedencia de la solicitud presentada por la parte apelante bajo los siguientes fundamentos: (1) que no lograron demostrar que se configuró una revocación de la autorización a la solicitud de control de acceso; y (2) que no demostraron que el término para solicitar revisión judicial del dictamen emitido por el Municipio de San Juan fue interrumpido.

El 2 de mayo de 2022, la parte apelada presentó su "Contestación a la Segunda Demanda Enmendada y Reconvención". Negó varias de las alegaciones contenidas en la "Segunda Demanda Enmendada" y, a su vez, reconvino contra la parte apelada, por ésta haber incumplido con su obligación de pagar las cuotas de mantenimiento adeudadas. Por esta razón, solicitó el pago de $30,521.49 de principal, intereses y recargos por cuotas adeudadas, más un balance adeudado por $6,301.04.

Atendidas las posiciones de ambas partes, el 30 de septiembre de 2022, el Tribunal de Primera Instancia emitió una "Sentencia" mediante la cual declaró Ha Lugar la "Moción para que se Dicte Sentencia Sumaria" y la Reconvención, ambas presentadas por UNDARE. Razonó que, el "Certificado de Aceptación/Adopción" suscrito por la Sra. Viviane Cósimi es válido y suficiente para obligar también a la Sra. Margarite Cósimi. De igual manera, concluyó que, la causa de acción por cobro de dinero presentada por UNDARE era procedente en derecho, pues la deuda reclamada era una líquida, vencida y exigible. Así, condenó a la parte apelante a satisfacer las siguientes cantidades, a saber: (1) $30,521.49 en concepto de cuotas de mantenimiento, intereses y cargos por demora; (2) $6,301.04 a la cuenta número 107307 (P); (3) una cuantía acumulada a base de $178 mensuales desde el 30 de noviembre de 2021 hasta la fecha en que se emitió la "Sentencia"; y (4) costas e interés legal vigente hasta el pago de la deuda.

En desacuerdo, el 19 de octubre de 2022, la parte apelante presentó una "Moción Solicitando Reconsideración, Enmienda a las Determinaciones de Hecho y Determinaciones Adicionales", y solicitó la reconsideración del dictamen mediante los siguientes argumentos, a saber: (1) que los requisitos de la Ley Núm. 21, *infra*, son de cumplimiento estricto, por lo que debía revisarse cuidadosamente su implementación, específicamente, las salvaguardas a los derechos constitucionales de libertad de expresión y asociación; (2) que el "Certificado de Aceptación/Adopción" no se firmó en el momento en que se realizó la gestión para obtener de los propietarios las autorizaciones necesarias para solicitar el control de acceso; (3) que la Sra. Margarite Cósimi solo podía renunciar a sus derechos constitucionales de forma expresa; (4) que no procedía descartar la defensa de prescripción ante la inexistencia de prueba que demostrase que la deuda no estaba prescrita; y (5) que no se presentó evidencia para demostrar que la cuota de mantenimiento se fijó conforme a derecho.

El 8 de noviembre de 2022, UNDARE presentó su "Oposición a Moción de Reconsideración" y, en esencia, sostuvo lo siguiente: (1) que el argumento de que se configuró una violación constitucional en la implementación de la Ley Núm. 21, *infra*, así como el que las cuotas de mantenimiento no fueron fijadas conforme a derecho, son argumentos tardíos que no fueron alegados en la "Demanda" ni en alguna otra moción dispositiva; (2) que las determinaciones de hecho adicionales no están sustentadas con prueba que las apoye; (3) que el peso de la prueba para demostrar la prescripción le corresponde a la parte apelante; y (4) que no se presentó evidencia para controvertir el hecho de que existe una deuda líquida, vencida y exigible.

Evaluadas las mociones presentadas por ambas partes, el 9 de noviembre de 2022, el Tribunal de Primera Instancia emitió una "Resolución" mediante la cual declaró No Ha Lugar la "Moción Solicitando Reconsideración, Enmienda a las Determinaciones de Hecho y Determinaciones Adicionales" presentada por la parte apelante.

Insatisfecha con dicha determinación, la parte apelante recurre ante este foro apelativo intermedio, y plantea la comisión de los siguientes errores, a saber:

1. *Erró el Honorable Tribunal de Primera Instancia al no examinar cuidadosamente la controversia de marras a la luz de lo resuelto en Asoc. CTRL. ACC. C. Maracaibo v. Cardona, 144 D.P.R. 1 (1997).*

2. *Erró el Honorable Tribunal de Primera Instancia al equiparar el endoso a un Dictamen Preliminar y el endoso a la Solicitud de Autorización.*

3. *Erró el Honorable Tribunal de Primera Instancia al determinar que la firma de la Sra. Viviane Cósimi era representativa de la vivienda y obligó a las Sras. Margerite Cósimi y Marguerite L. Ancher.*

4. *Erró el Honorable Tribunal de Primera Instancia al condenar al pago de la deuda de forma sumaria cuando la prueba estipulada controvertió la presunción de legalidad de la totalidad del monto reclamado.*

5. *Erró el Honorable Tribunal de Primera Instancia al disponer de la defensa de prescripción de las apelantes sin mediar prueba o justificación alguna en el expediente que amerite dicho proceder.*

**II.**

**-A-**

La sentencia sumaria es un mecanismo procesal provisto por nuestro ordenamiento con el fin de propiciar la solución justa, rápida y económica de pleitos que no contengan controversias genuinas de hechos materiales, y en los cuales resulta innecesaria la celebración de un juicio. *Rosado Reyes v. Global Healthcare,* 205 DPR 796, 808 (2020); *Meléndez González et al. v. M. Cuebas,*

193 DPR 100, 115 (2015); *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 430 (2013).

La Regla 36 de Procedimiento Civil, 32 LPRA Ap. V., R. 36, regula el mecanismo de sentencia sumaria. En lo pertinente, procede dictar sentencia sumaria si de las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, junto a cualquier declaración jurada, si alguna, demuestran la inexistencia de controversia real y sustancial sobre algún hecho esencial y pertinente y que, como cuestión de derecho procede hacerlo. Regla 36.3(e) de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3(e); *Rosado Reyes v. Global Healthcare*, *supra*, a las págs. 808 y 809.

El promovente de la sentencia sumaria deberá demostrar que no existe controversia real sustancial de ningún hecho material. Regla 36.3(a) de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3(a); *Rosado Reyes v. Global Healthcare*, *supra*, a la pág. 808. Un hecho material es definido como aquel que "puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable". *Const. José Carro v. Mun. Dorado*, 186 DPR 113, 129-130 (2012). Se podrá derrotar una moción de sentencia sumaria si existe una "duda que permita concluir que existe una controversia real y sustancial sobre hechos relevantes y pertinentes". *Íd.*, a la pág. 130; *Pepsi-Cola v. Mun. Cidra et al.*, 186 DPR 713, 756 (2012).

La Regla 36.3(a) de Procedimiento Civil, *supra*, dispone que la moción de sentencia sumaria deberá contener:

> *1. Una exposición breve de las alegaciones de las partes;*
> *2. los asuntos litigiosos o en controversia;*
> *3. la causa de acción, reclamación o parte respecto a la cual es solicitada la sentencia sumaria;*
> *4. una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así*

*como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal;*
*5. las razones por las cuales debe ser dictada la sentencia, argumentando el derecho aplicable, y*
*6. el remedio que debe ser concedido.*

Por su parte, quien se opone a la sentencia sumaria deberá presentar su contestación dentro del término de 20 días desde que fue notificada. Regla 36.3(b) de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3(b). Si ésta no presenta su contestación dentro del referido término, se entenderá que la moción de sentencia sumaria queda sometida para la consideración del tribunal. Regla 36.3(e) de Procedimiento Civil, *supra.* Además, deberá "contestar de forma tan detallada y específica como lo haya hecho la parte promovente". Regla 36.3(c) de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3(c). De igual forma, deberá relacionar de forma concisa los párrafos, según enumerados por la parte promovente, que a su juicio están en controversia y deberá refutar los hechos materiales que están en controversia presentando evidencia sustancial. Regla 36.3(b)(2) de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3(b)(2); SLG *Fernández-Bernal v. RAD-MAN et al.,* 208 DPR 310, 336 (2021), *Rosado Reyes v. Global Healthcare, supra,* a la pág. 808; *Pepsi-Cola v. Mun. Cidra et al., supra,* a la pág. 756.

Toda inferencia que se haga de los hechos incontrovertidos, debe efectuarse de la forma más favorable a la parte que se opone a la sentencia sumaria. *Const. José Carro v. Mun. Dorado, supra,* a la pág. 130; *Pepsi-Cola v. Mun. Cidra et al., supra,* a la pág. 756. Nuestro Tribunal Supremo ha expresado que, "el hecho de que la otra parte no presente prueba que controvierta la evidencia presentada por la parte promovente de la moción de sentencia sumaria, no implica necesariamente que dicha moción procederá automáticamente si en verdad existe una controversia sustancial sobre hechos esenciales y materiales". SLG *Fernández-Bernal v.*

*RAD-MAN et al., supra,* a la pág. 337. No se dictará sentencia sumaria cuando: (1) existen hechos materiales y esenciales controvertidos; (2) hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material y esencial, o (4) como cuestión de derecho no procede. *Pepsi-Cola v. Mun. Cidra et al., supra,* a la pág. 756. Tampoco procede dictar sentencia por la vía sumaria "en casos en donde existe controversia sobre elementos subjetivos, de intención, propósitos mentales o negligencia, o cuando el factor de credibilidad es esencial y está en disputa". *Ramos Pérez v. Univisión,* 178 DPR 200, 219 (2010).

Nuestro Máximo Foro ha reiterado que el Tribunal de Apelaciones se encuentra en igual posición que los tribunales de primera instancia al revisar solicitudes de sentencia sumaria. *Rosado Reyes v. Global Healthcare, supra,* a la pág. 809. Es por lo que, el Tribunal de Apelaciones "está regido por la Regla 36 de Procedimiento Civil, *supra,* y aplicará los mismos criterios que esa regla y la jurisprudencia le exigen al foro primario". *Meléndez González et al. v. M. Cuebas, supra,* a la pág. 118. El Tribunal de Apelaciones no podrá considerar documentos que no fueron presentados ante el foro primario, ni adjudicar hechos materiales y esenciales en controversia. *Íd.,* a las págs. 114 y 115. Los criterios a seguir por este tribunal, al atender la revisión de una sentencia sumaria dictada por el foro primario, han sido enumerados con exactitud por nuestro Tribunal Supremo. *Roldán Flores v. M. Cuebas et al,* 199 DPR 664, 679 (2018). A tenor, el Tribunal de Apelaciones debe:

> *1) examinar de novo el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, supra, y la jurisprudencia le exigen al foro primario;*

*2) revisar que tanto la Moción de Sentencia Sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36, supra;*

*3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos, y*

*4) de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar de novo si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia.*

**-B-**

La Ley Núm. 21 de 20 de mayo de 1987, 23 LPRA sec. 64 *et seq.*, también conocida como la Ley de Control de Acceso de 1987, según enmendada, autorizó a los municipios de Puerto Rico a conceder permisos a las urbanizaciones, con el fin de controlar el acceso vehicular y el uso público de sus calles.  Para someter una urbanización a un régimen de control de acceso, la propia ley estableció ciertos requisitos, entre ellos, el siguiente:

*A los fines de poder solicitar y obtener el permiso a que se refiere la Sección 1 de esta ley, se deberán cumplir los siguientes requisitos:*

*[...]*

*c)* ***Que la solicitud de autorización para controlar el acceso o los accesos a la urbanización, calle o comunidad sea adoptada por lo menos por tres cuartas (3/4) partes de los propietarios de las viviendas allí establecidas. La participación de dichos propietarios estará limitada a un propietario por vivienda y deberá constar por escrito bajo la firma de cada uno de ellos.*** *Una autorización para solicitar el permiso para controlar el acceso o accesos a la urbanización, calle o comunidad prestada voluntariamente por un propietario mayor de edad y* ***en representación de una vivienda****, obligará al propietario a cumplir con lo dispuesto en la Sección 10 de esta ley y* ***estará en pleno efecto y vigor mientras no se emita un documento escrito que claramente revoque la autorización prestada con fecha anterior. Una revocación de autorización para solicitar el permiso para controlar el acceso o accesos a la urbanización, calle o comunidad será válida únicamente si se presenta en cualquier momento hasta la fecha de celebración de la primera vista pública.*** *Luego de esta fecha aplicará lo dispuesto en la Sección 10 de esta ley.*

***Aquellas personas que favorezcan la implantación del sistema, deberán hacerlo expresamente y por escrito***, *en el momento en que se lleve a cabo la gestión para obtener de los propietarios las autorizaciones necesarias para solicitar el permiso de control de acceso.* Sección 3 (c) de la Ley Núm. 21 de 20 de mayo de 1987, 23 LPRA sec. 64a.

(Énfasis nuestro).

Una vez se ha prestado la autorización escrita por cualquiera de los propietarios del inmueble, éstos quedarán obligados al pago de "una cuota para cubrir los costos y gastos de instalación, operación y mantenimiento del sistema de control de acceso, incluyendo los salarios o jornales del personal contratado". Sec. 11 (a) de la Ley Núm. 21 de 20 de mayo de 1987, 23 LPRA sec. 64d-3. Además, el propio estatuto establece que la obligación de pago recaerá, entre otras personas, en "[l]os propietarios que autorizaron la solicitud para establecer el control de acceso, según fue implantado". *Íd.*

Luego de que la solicitud de autorización del control de acceso sea adoptada por tres cuartas (3/4) partes de los propietarios de las viviendas de la urbanización, y de cumplirse los demás criterios esbozados en la Sección 3 (c) de la Ley Núm. 21 de 20 de mayo de 1987, *supra,* deberá radicarse una petición de permiso o autorización de control de acceso en el municipio que radiquen las calles que su acceso se proponga controlar. Sección 4 (a) de la Ley Núm. 21 de 20 de mayo de 1987, 23 LPRA sec. 64b. Posteriormente, el municipio celebrará vistas públicas y enviará copia de la solicitud de control de acceso a las agencias pertinentes. Sección 4 (a) (b) de la Ley Núm. 21 de 20 de mayo de 1987, *supra.* Tras la celebración de la primera vista pública, cada agencia deberá expresar por escrito si favorece o se opone al control de acceso propuesto. Sección 4 (c) de la Ley Núm. 21 de 20 de mayo de 1987, *supra.* Celebrada la última vista pública, el municipio emitirá su decisión. Sección 4 (d) de la Ley Núm. 21 de

20 de mayo de 1987, *supra*. Si el Municipio favorece el control de acceso propuesto, emitirá un dictamen final y autorizará su implantación. *Íd.* En cambio, si el municipio modifica o establece restricciones a los controles propuestos, éste emitirá un dictamen preliminar, el cual deberá adoptarse "mediante declaración firmada por no menos de tres cuartas (3/4) partes de los propietarios". *Íd.* Toda persona que esté en desacuerdo con la decisión del municipio, podrá solicitar revisión judicial dentro de los 20 días siguientes a la fecha de archivo de copia de la notificación concediendo el permiso de control de acceso. Sección 4 (e) de la Ley Núm. 21 de 20 de mayo de 1987, *supra*.

Cabe resaltar el hecho de que, "[l]os propietarios que no autorizaron expresamente el establecimiento del sistema de control de acceso no estarán obligados al pago de cuotas para el establecimiento, operación, mantenimiento o remoción de dicho sistema excepto en aquellos casos en que se comprometan a dichos pagos mediante contrato escrito". Sección 16 de la Ley Núm. 21 de 20 de mayo de 1987, 23 LPRA sec. 64g. De así hacerlo, estos propietarios estarán sujetos a las obligaciones dispuestas en la Sección 11 de la Ley Núm. 21 de 20 de mayo de 1987, *supra*.

Por otro lado, es menester mencionar que, en el caso de *Asoc. Ctrl. Acc. C. Maracaibo v. Cardona*, 144 DPR 1 (1997), nuestro Tribunal Supremo resolvió que la Ley sobre Control de Acceso, *supra*, constituye una delegación válida de poder estatal a entidades privadas, y no violenta las cláusulas constitucionales sobre la igual protección de las leyes, debido proceso de ley y el derecho a la intimidad. Adicionalmente, nuestro Máximo Foro razonó que, al implantar los sistemas de control de acceso, las urbanizaciones deberán seguir los siguientes parámetros, a saber:

1. *Deberán poner una notificación que dé aviso adecuado de los requisitos que se le requerirán al conductor, de manera que si no está de acuerdo con ellos pueda retroceder antes de detenerse frente a la persona encargada de controlar el acceso.*

2. *Igualmente, deberán existir avisos informándole a los conductores de la existencia de un área de acceso controlado y que al llegar al punto de control deberán detener sus vehículos brevemente con el objetivo de indagar su nombre y destino o propósito.*

3. *La detención en el punto de control no deberá tomar más tiempo que el que sea razonable para hacer las mencionadas averiguaciones.*

4. *Las preguntas que podrán realizarse se limitarán a: el nombre del conductor, el lugar o destino o, en su defecto, el propósito de la visita.*

5. *El guardia podrá, además, obtener toda otra información a través de sus sentidos.*

6. *El guardia podrá anotar toda la información que obtenga mediante los mecanismos consignados en los incisos 4 y 5.*

7. *Las asociaciones de residentes podrán establecer horarios nocturnos en los cuales no se podrá entrar al área sujeta al sistema de control, aun para propósitos legítimos, ello de conformidad con las particularidades de la comunidad y sujeto a un análisis de razonabilidad.*

8. *La omisión de brindar cualquier información que le sea requerida puede dar base a que se le impida el acceso.*

9. *Sólo podrá llevarse un registro de visitas si el residente lo autoriza.*

10. *Iguales criterios aplican para controlar el acceso peatonal a las áreas sujetas al régimen de control. Íd., a las págs. 76-77. Véase, además, págs. 38-40.*

Concluyó que, el motivo fundado o sospecha razonable de que el visitante podría cometer un delito no es la única circunstancia en que podría denegarse la entrada de un visitante a la urbanización. Sino que, "la omisión de brindar el destino o propósito de la visita, así como el nombre del visitante, cuando el residente haya autorizado su indagación, puede dar base para no permitir el acceso a una comunidad o urbanización". *Íd.*, a la pág. 50.

Finalmente, la Sección 11 (b) de la Ley Núm. 21 de 20 de mayo de 1987, *supra*, dispone que:

> *La cantidad proporcional con que debe contribuir cada uno de dichos propietarios a los gastos señalados se determinará, fijará e impondrá al principio de cada año calendario o fiscal y vencerá y será pagadera en plazos mensuales. El Reglamento de la urbanización podrá disponer el cobro de una penalidad de hasta diez por ciento (10%) de lo adeudado si transcurren quince (15) días de la fecha fijada para el pago de la mensualidad.*

**-C-**

Una comunidad de bienes existe "cuando la propiedad de una cosa o de un derecho pertenece pro indiviso a varias personas". Art. 326 del Código Civil, 31 LPRA sec. 1271. En otras palabras, hay comunidad de bienes cuando dos o más personas son titulares en común de un mismo derecho o cosa. En estos casos, la participación de los comuneros, tanto en los beneficios como en las cargas, será proporcional a sus respectivas cuotas, las cuales "[s]e presumirán iguales, mientras no se pruebe lo contrario". Art. 327 del Código Civil, 31 LPRA sec. 1272. Por consiguiente, el derecho o la cosa común le pertenece en partes iguales a la pluralidad de sujetos, salvo que uno de estos demuestre tener una participación mayor.

Sobre los actos de administración sobre la cosa común, serán obligatorios los acuerdos de la mayoría de los partícipes. Art. 332 del Código Civil, 31 LPRA sec. 1277. Esto es así, pues, como el derecho o la cosa común pertenece a una pluralidad de sujetos, un comunero no puede perjudicar a los demás condueños. O sea, que el interés colectivo de cada comunero supera el interés individual que cada uno de estos pueda tener sobre la comunidad, con el fin de evitar cualquier perjuicio sobre esta. En consecuencia, las gestiones relacionadas al derecho o la cosa común siempre exigirán cierto grado de acuerdo entre los copropietarios.

En lo concerniente, nuestro Alto Foro ha expresado que "no hay duda de que el referido acto [refiriéndose al acto de prestar autorización para que un inmueble quede sujeto a un sistema de control de acceso] constituye un acto de administración y mejor disfrute de la cosa común".[7] *Residentes Sagrado Corazón v. Arsuaga*, 160 DPR 289, 311 (2003). Por ende, la única forma de que un comunero pueda autorizar el establecimiento de un sistema de control de acceso y obligar, con su actuación, a los demás copropietarios, es si ese acto cuenta con el consentimiento de la mayoría de los copartícipes. *Íd.*, a la pág. 312. De lo contrario, tal actuación "no debe perjudicar o afectar a los demás condueños". *Íd.*, citando a M. Albaladejo, Comentarios al Código Civil y Compilaciones Forales, Madrid, Ed. Rev. Der. Privado, 1985, T. V, Vol. II, pág. 413-414. En fin, "[l]a única manera en que uno de los copropietarios puede ofrecer una autorización que sea representativa de la vivienda, reflejando así la voluntad, el sentir y la aceptación de todos los propietarios de ella, es a través de un acuerdo unánime con éstos, o al menos mayoritario".

**-D-**

Como se sabe, "[l]as obligaciones nacen de la ley, de los contratos y cuasicontratos, y de los actos y omisiones ilícitos o en que intervenga cualquier género de culpa o negligencia". Art. 1042 del Código Civil, 31 LPRA sec. 2992. Nuestro Código Civil dispone que "[e]l contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio". Art. 1206 del Código Civil, 31 LPRA sec. 3371. Adicionalmente, establece que "[l]os contratos se

---

[7] No supone un acto de conservación, en el cual un comunero no necesita el consentimiento de los demás copropietarios para ejecutarlo. Tampoco es un acto de alteración de la cosa común, el cual requiere consentimiento unánime de los copartícipes. Esto, ya que someter un inmueble a un sistema de control de acceso no es indispensable para evitar su deterioro (acto de conservación), y tampoco constituye un cambio en la sustancia ni en el destino del inmueble (alteración de la cosa común).

perfeccionan por el mero consentimiento, y desde entonces obligan, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley". Art. 1210 del Código Civil, 31 LPRA sec. 3375. Una vez las partes prestan su consentimiento, estos quedarán obligados al cumplimiento de la obligación pactada, ya que "[l]as obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes, y deben cumplirse al tenor de los mismos". Art. 1044 del Código Civil, 31 LPRA sec. 2994.

Por tanto, como norma general, un contrato será obligatorio sin importar la forma en que se haya celebrado, siempre y cuando concurran las condiciones esenciales para su validez. Art. 1230 del Código Civil, 31 LPRA sec. 3451. Esa obligación que posee una parte para cumplir con lo pactado "se fundamenta en el principio de la buena fe, el cual exige no defraudar la confianza que otro ha puesto en una promesa o conducta". *BPPR v. Sunc. Talavera,* 174 DPR 686, 693 (2008). Así, para que un contrato se considere válido, se requiere que concurran tres elementos esenciales, a saber: (1) consentimiento de los contratantes, (2) objeto cierto del contrato y (3) la causa de la obligación que se establezca. *Aponte Valentín et al. v. Pfizer Pharm.,* 208 DPR 263, 284, (2021). La falta de alguno de ellos será causa de nulidad del contrato y, por tanto, inexistente en el orden jurídico. *Rosario Rosado v. Pagán Santiago,* 196 DPR 180, 188 (2016).

En Puerto Rico impera el principio de libertad de contratación. Por consiguiente, las partes contratantes "pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público". Art. 1207 del Código Civil, 31 LPRA sec. 3372. A tenor, la autonomía que brinda la libertad de

contratación no es ilimitada, pues "[l]a facultad para contratar no puede ejercerse abusivamente ni en oposición a una disposición legal". *Pérez Rodríguez v. López Rodríguez et al.*, 2022 TSPR 95, 210 DPR ___. Cónsono con ello, el contrato, además de expresar y reflejar la voluntad y libertad de la persona, constituye un instrumento "de justicia y de interés social". *Payano v. SLG Cruz Pagán*, 2022 TSPR 78, 209 DPR ___.

### -E-

Para que una deuda pueda ser reclamada por vía judicial, ésta deberá estar vencida, líquida y exigible. *RMCA v. Mayol Bianchi*, 208 DPR 100, 108 (2021). Según ha expresado nuestro Tribunal Supremo, la deuda es líquida si la cantidad reclamada es cierta y determinada. *Ramos y otros v. Colón y otros*, 153 DPR 534, 546 (2001). Por su parte, es exigible cuando la obligación no está sujeta a ninguna causa de nulidad y pueda demandarse su cumplimiento. *Guadalupe v. Rodríguez*, 70 DPR 958, 966 (1950). En resumen, una deuda es líquida cuando se sabe cuánto es lo que se debe, y se considera exigible cuando la obligación no está sujeta a ninguna causa de nulidad. Si la deuda reclamada cumple con estos criterios, el acreedor está habilitado para reclamarla ante su vencimiento.

Por su parte, en pleito como el de autos, en el cual se solicita el cobro de dinero, es necesario determinar, para efectos de prescripción, si la acción ejercitada tiene un término fijo para ser presentada. Lo anterior, pues el Art. 1864 del Código Civil, 31 LPRA sec. 5294, dispone que, prescribirán a los 15 años las acciones personales que no tengan señalado término especial de prescripción. En cambio, el Art. 1866 del Código Civil, 31 LPRA sec. 5296, provee lo siguiente:

> *Por el transcurso de cinco (5) años prescriben las acciones para exigir el cumplimiento de las obligaciones siguientes:*

*1. La de pagar pensiones alimenticias.*

*2. La de satisfacer el precio de los arriendos, sean éstos de fincas rústicas o de fincas urbanas.*

*3. **La de cualesquiera otros pagos que deban hacerse por años o en plazos más breves**.*

(Énfasis nuestro).

La jurisprudencia interpretativa de este artículo reconoce que, **para determinar la aplicabilidad del plazo quinquenal prescriptivo, es necesario distinguir entre el pago de una obligación única que ha sido fraccionada, y una sucesión de prestaciones separables**. *Asoc. Empleados E.L.A. v. Guillén,* 116 DPR 425 (1985). Lo anterior, pues, "[e]l propósito primordial de esa prescripción… es proteger al deudor de la acumulación ruinosa de rentas, pensiones, intereses y otras prestaciones autónomas de ese género, mas no escudarle con prescripción de término tan corto del pago de préstamos y obligaciones de similar naturaleza". *Íd.*, a la pág. 430.

**III.**

En su primer señalamiento de error, la parte apelante sostiene que el Tribunal de Primera Instancia "cometió el error de no dar ese examen cuidadoso sobre la implantación de la Ley", según la normativa expuesta por nuestro Tribunal Supremo en *Asoc. Ctrl. Acc. C. Maracaibo v. Cardona, supra.* Fundamenta su posición en que "[e]n el presente caso, la controversia es, precisamente, si se cumplió con todos los requisitos que impone la Ley Núm. 21 para obligar a las Apelantes al pago de la cuota de mantenimiento". Por esta razón, entiende que "corresponde hacer un análisis cuidadoso del cumplimiento con todos los requisitos que surgen de la Ley Núm. 21".

Según adelantamos en el acápite anterior, en el caso de *Asoc. Ctrl. Acc. C. Maracaibo v. Cardona, supra,* nuestro Máximo

Foro sostuvo la validez constitucional de la *Ley de Control de Acceso* de 1987, *supra,* por tratarse de un ejercicio válido de delegación de poderes. A su vez, determinó que dicho estatuto no violenta los derechos constitucionales a la intimidad, igual protección de las leyes y debido proceso de ley. Adicionalmente, estableció ciertos parámetros que las urbanizaciones deben garantizar al implantar sus sistemas de control de acceso,[8] con el fin de delimitar "el máximo de intervención que consideramos permisible sin que queden frustrados los propósitos de la ley". *Íd.,* a la pág. 40.

Como puede observarse, la parte apelante no ha cuestionado la validez constitucional de la *Ley de Control de Acceso* de 1987, *supra.* Tampoco ha hecho alegación o reclamo alguno dirigido a cuestionar, o que no se le hayan garantizado, los parámetros que las urbanizaciones deben cumplir al implantar sus sistemas de control de acceso. Como la controversia no versa sobre si

---

[8] Para su fácil identificación, reiteramos que los parámetros son los siguientes:

1. *Deberán poner una notificación que dé aviso adecuado de los requisitos que se le requerirán al conductor, de manera que si no está de acuerdo con ellos pueda retroceder antes de detenerse frente a la persona encargada de controlar el acceso.*

2. *Igualmente, deberán existir avisos informándole a los conductores de la existencia de un área de acceso controlado y que al llegar al punto de control deberán detener sus vehículos brevemente con el objetivo de indagar su nombre y destino o propósito.*

3. *La detención en el punto de control no deberá tomar más tiempo que el que sea razonable para hacer las mencionadas averiguaciones.*

4. *Las preguntas que podrán realizarse se limitarán a: el nombre del conductor, el lugar o destino o, en su defecto, el propósito de la visita.*

5. *El guardia podrá, además, obtener toda otra información a través de sus sentidos.*

6. *El guardia podrá anotar toda la información que obtenga mediante los mecanismos consignados en los incisos 4 y 5.*

7. *Las asociaciones de residentes podrán establecer horarios nocturnos en los cuales no se podrá entrar al área sujeta al sistema de control, aun para propósitos legítimos, ello de conformidad con las particularidades de la comunidad y sujeto a un análisis de razonabilidad.*

8. *La omisión de brindar cualquier información que le sea requerida puede dar base a que se le impida el acceso.*

9. *Sólo podrá llevarse un registro de visitas si el residente lo autoriza.*

10. *Iguales criterios aplican para controlar el acceso peatonal a las áreas sujetas al régimen de control.*

UNDARE estableció un control de acceso que rebase los poderes delegados, resulta innecesario hacer un análisis sobre este asunto.

Por el contrario, según admite la propia parte apelante en sus escritos,[9] la controversia a dilucidar es la siguiente: Si la autorización prestada por la Sra. Viviane Cósimi constituye la autorización representativa de la propiedad, según requerida por la Ley de Control de Acceso de 1987, *supra*. Por consiguiente, no resulta necesario hacer un análisis sobre la validez constitucional de la precitada legislación, ni mucho menos determinar si se cumplió o no con los parámetros establecidos en el caso de *Asoc. Ctrl. Acc. C. Maracaibo v. Cardona, supra*. Sino que, para resolver el asunto, basta con recurrir al texto de la Ley de Control de Acceso de 1987, *supra,* y su jurisprudencia interpretativa. Por ende, el primer error no fue cometido.

En cuanto al segundo señalamiento de error, la parte apelante aduce que el foro recurrido erró al equiparar el endoso a un Dictamen Preliminar y el endoso a la Solicitud de Autorización. Argumenta que, "la solicitud de autorización, que surge de la Sección 3 (c) de la Ley Núm. 21, y el dictamen preliminar que emite el Municipio al favorecer el control de acceso, pero con 'condiciones cambios o modificaciones' son dos instrumentos diferentes con propósitos y efectos jurídicos distinguibles del uno y del otro". (Énfasis en el original). Así, sostiene que "el Legislador simplemente no quiso que el endoso al Dictamen Preliminar obligue a pagar la cuota de mantenimiento".

De conformidad con el derecho ya discutido, la Sección 3 (c) de la Ley Núm. 21 de 20 de mayo de 1987, *supra,* provee que:

> *A los fines de poder solicitar y obtener el permiso a que se refiere la Sección 1 de esta ley, se deberán cumplir los siguientes requisitos:*
>
> […]

---

[9] Véase, por ejemplo, "Demanda Enmendada" alegaciones 29 y 54.

*c)* ***Que la solicitud de autorización para controlar el acceso o los accesos a la urbanización, calle o comunidad sea adoptada por lo menos por tres cuartas (3/4) partes de los propietarios de las viviendas allí establecidas. La participación de dichos propietarios estará limitada a un propietario por vivienda y deberá constar por escrito bajo la firma de cada uno de ellos.*** *Una autorización para solicitar el permiso para controlar el acceso o accesos a la urbanización, calle o comunidad prestada voluntariamente por un propietario mayor de edad y* ***en representación de una vivienda,*** *obligará al propietario a cumplir con lo dispuesto en la Sección 10 de esta ley y* ***estará en pleno efecto y vigor mientras no se emita un documento escrito que claramente revoque la autorización prestada con fecha anterior.*** ***Una revocación de autorización para solicitar el permiso para controlar el acceso o accesos a la urbanización, calle o comunidad será válida únicamente si se presenta en cualquier momento hasta la fecha de celebración de la primera vista pública.*** *Luego de esta fecha aplicará lo dispuesto en la Sección 10 de esta ley.* ***Aquellas personas que favorezcan la implantación del sistema, deberán hacerlo expresamente y por escrito,*** *en el momento en que se lleve a cabo la gestión para obtener de los propietarios las autorizaciones necesarias para solicitar el permiso de control de acceso.*

(Énfasis nuestro).

De lo anterior, podemos colegir que, con el fin de obtener un permiso de control de acceso, deberá efectuarse una **solicitud de autorización**, la cual deberá ser adoptada por tres cuartas (3/4) partes de los propietarios de las viviendas establecidas en la urbanización.

Posteriormente, y según dispone la Sección 4 (a) de la Ley Núm. 21 de 20 de mayo de 1987, *supra*, deberá radicarse una **petición de permiso o autorización de control de acceso** en el municipio. Luego del trámite correspondiente, **y si el municipio favorece los controles propuestos**, este último emitirá un **dictamen final**. No obstante, si el municipio no favorece los controles según propuestos, y decide modificarlos o establecer restricciones, emitirá un **dictamen preliminar**. Sección 4 (d) de la Ley Núm. 21 de 20 de mayo de 1987, *supra*. En este caso, dicho

**dictamen preliminar**, deberá adoptarse "mediante declaración firmada por no menos de tres cuartas (3/4) partes de los propietarios". *Íd.* Lo anterior, pues, como el **dictamen preliminar** contiene modificaciones o restricciones que no estaban incluidas en la **solicitud de autorización** previamente aprobada, se exige nuevamente su aprobación mediante declaración firmada por tres cuartas (3/4) partes de los propietarios. Una vez se archiva en el municipio la declaración antes mencionada, el **dictamen preliminar** será firme. *Íd.*

En el caso de marras, varios residentes se unieron para crear un comité, con el fin de preparar una **petición de permiso o autorización de control de acceso**, y solicitarle al municipio el control de acceso a su urbanización. Por esta razón, el 5 de febrero de 1992, la Sra. Viviane Cósimi y su esposo, el señor Jaime Fortuño, suscribieron el documento titulado "Declaración" en el cual manifestaron estar conformes con la petición de cierre y control de acceso, y autorizaron a UNDARE a llevar a cabo los procedimientos necesarios para ello. Asimismo, indicaron estar de acuerdo con la aportación de una cuota de instalación, y una cuota mensual adicional.[10] Posteriormente, el Municipio de San Juan emitió un **dictamen preliminar**, por lo que, en aras de conseguir nuevamente la aprobación del control de acceso mediante declaración firmada por 3/4 partes de los propietarios, el 28 de septiembre de 1992, UNDARE cursó un "Certificado de Aceptación y Adopción", el cual fue firmado por la Sra. Viviane Cósimi. En éste, hizo constar, bajo juramento, que había recibido copia del **dictamen preliminar**, y que no tenía objeción a que se implementara el control de acceso, **según establecido en dicho dictamen**. Empero, en el aludido "Certificado de Aceptación y

---

[10] Véase, Ap. a la pág. 541.

Adopción", la Sra. Viviane Cósimi incluyó una nota la cual lee como sigue: "No estoy de acuerdo con las cuotas".

No obstante lo anterior, coincidimos con el Tribunal de Primera Instancia de que dicha nota no constituye una revocación de autorización para solicitar el control de acceso a la urbanización. En primer lugar, la Sección 3 (c) de la Ley Núm. 21 de 20 de mayo de 1987, *supra*, dispone que "[u]**na revocación**... **será válida únicamente si se presenta en cualquier momento hasta la fecha de celebración de la primera vista pública**". (Énfasis suplido). Según consta en las determinaciones de hecho realizadas por el foro primario, el Municipio de San Juan celebró un total de cuatro (4) vistas públicas. **La primera de ellas se efectuó el 24 de junio de 1992**. Por lo que, cualquier revocación hecha con posterioridad a esta fecha es insuficiente. Como ya indicamos, no fue hasta el **28 de septiembre de 1992** que la Sra. Viviane Cósimi manifestó su desacuerdo con las cuotas. En consecuencia, "aplicará lo dispuesto en la Sección [11] de esta ley", y los propietarios del inmueble quedaron obligados al pago de la cuota. *Íd.*

Además, la nota incluida por la Sra. Viviane Cósimi en el "Certificado de Aceptación y Adopción" no constituye una expresión que "**claramente revoque la autorización prestada**", según lo exige la ley. *Íd.* (Énfasis nuestro). Como si fuera poco, este **dictamen preliminar no fue el que finalmente se aprobó**. Sino que, el dictamen preliminar bajo el cual se implementó el control de acceso fue emitido por el Municipio el **12 de septiembre de 1995**. Este último, fue favorecido por la Sra. Viviane Cósimi el 15 de noviembre del mismo año, **de forma expresa**, **por escrito y sin objeción alguna**.

La Ley de Control de Acceso de 1987, *supra*, claramente dispone que, una vez se firma y aprueba el dictamen preliminar, el

propietario que estuvo a favor de su aprobación estará obligado a pagar la cuota. Por ende, el argumento de la parte apelante de que el endoso del dictamen preliminar no fue suficiente para obligarle a pagar la cuota de mantenimiento, no se sostiene en derecho. El segundo error tampoco fue cometido.

En su tercer señalamiento de error, la parte apelante esgrime que el consentimiento prestado por la Sra. Viviane Cósimi no fue representativo de la vivienda, por lo que resulta inválido e insuficiente para sujetar la propiedad al control de acceso, y obligar a los demás copropietarios al pago de las cuotas. Fundamenta su posición en que, como la Sra. Viviane Cósimi no representaba la mayoría de los comuneros, no podía, por sí sola, autorizar válidamente el control de acceso.

Conforme el derecho antes expuesto, la única forma de que un comunero puede autorizar el establecimiento de un sistema de control de acceso y obligar, con su actuación, a los demás copropietarios, es **si ese acto cuenta con el consentimiento de la mayoría de los copartícipes**. Por tanto, para que un copropietario pueda ofrecer una autorización representativa de la vivienda, según exigido por ley, **es necesario un acuerdo mayoritario entre los comuneros**.

Según las determinaciones de hecho realizadas por el Tribunal de Instancia, y las deposiciones efectuadas por las partes, surge el hecho inequívoco de que, para el **15 de noviembre de 1995**, fecha en que la Sra. Viviane Cósimi firmó el "Certificado de Aceptación y Adopción" consintiendo al control de acceso, **los demás comuneros estaban conformes con dicha actuación**. La Sra. Viviane Cósimi firmó **tres** documentos indicando que no tenía objeción a que se implementara el control de acceso. Aunque, señaló no estar de acuerdo con el pago de las cuotas en el "Certificado de Aceptación y Adopción" de 1992, posteriormente

suscribió otro "Certificado de Aceptación y Adopción" en el 1995, documento casi idéntico al anterior, y que fue el que finalmente dio paso a que se implementara el control de acceso, y **nada mencionó al respecto**. **Tampoco fue revocada por escrito**. Para oponerse, bastaba con no prestar su autorización. Por su parte, la señora Margarite Louise Ancher (Sra. Louise Ancher), madre de la Sra. Viviane Cósimi, **consultaba con su hija las decisiones que tenían que ver con la casa**, **pero era ella quien las tomaba**.[11] Por último, la Sra. Margarite Cósimi, hermana de la Sra. Viviane Cósimi, declaró que ella **estaba de acuerdo con las decisiones que tomara su hermana y su madre sobre la residencia**, ya que "ellas eran las que vivían la casa, o sea, que **yo aceptaba lo que ellas decidieran**".[12]  (Énfasis suplido).

Estas declaraciones demuestran que, tanto la Sra. Viviane Cósimi, así como la Sra. Louise Ancher, **conocían sobre el control de acceso a ser implementado**, **y del pago de las cuotas**. Además, la Sra. Margarite Cósimi **nunca se opuso a esto**, **sino que aportó al pago de las cuotas**.[13]  A pesar de esto, la parte apelante sostiene que, como no consintieron por escrito, nunca se obligaron. No le asiste la razón. Reiteramos que la la Sección 3 (c) de la Ley Núm. 21 de 20 de mayo de 1987, *supra*, dispone que:

> *A los fines de poder solicitar y obtener el permiso a que se refiere la Sección 1 de esta ley, se deberán cumplir los siguientes requisitos:*
>
> *[…]*
>
> *c) Que la solicitud de autorización para controlar el acceso o los accesos a la urbanización, calle o comunidad sea adoptada por lo menos por tres cuartas (3/4) partes de los **propietarios** de las viviendas allí establecidas. La participación de dichos **propietarios** estará limitada a un **propietario** por vivienda y deberá constar por escrito bajo la firma **de cada uno de ellos**. Una autorización para solicitar el permiso para controlar el acceso o accesos a la urbanización, calle o*

---

[11] Véase, Ap. a la pág. 449.

[12] Véase, Ap. a la pág. 494.

[13] Véase, Ap. a la pág. 496.

*comunidad prestada voluntariamente por un propietario mayor de edad y **en representación de una vivienda**, obligará al propietario a cumplir con lo dispuesto en la Sección 10 de esta ley y estará en pleno efecto y vigor mientras no se emita un documento escrito que claramente revoque la autorización prestada con fecha anterior. Una revocación de autorización para solicitar el permiso para controlar el acceso o accesos a la urbanización, calle o comunidad será válida únicamente si se presenta en cualquier momento hasta la fecha de celebración de la primera vista pública. Luego de esta fecha aplicará lo dispuesto en la Sección 10 de esta ley. **Aquellas personas que favorezcan la implantación del sistema, deberán hacerlo expresamente y por escrito**, en el momento en que se lleve a cabo la gestión para obtener de los propietarios las autorizaciones necesarias para solicitar el permiso de control de acceso.*

(Énfasis nuestro).

Tras un análisis de la precitada disposición legal, notamos que, son los propietarios de las viviendas quienes deberán autorizar, por escrito y bajo su firma, el control de acceso. Ahora bien, se limita la participación a **un solo propietario**, el cual firma **en representación de la vivienda**. Dicho propietario, que es el que se toma en consideración al momento de cuantificar las (3/4) partes, deberá favorecer de forma expresa y por escrito el control de acceso. **Los demás propietarios de la vivienda no tienen que favorecer de forma expresa y por escrito el control de acceso. Solo el que firma en representación de la vivienda**. Por esta razón, nuestro Tribunal Supremo ha expresado que:

*La limitación impuesta a los efectos de que la participación sea de un propietario por vivienda responde al propósito de impedir que pueda obtenerse el 75% exigido por ley para autorizar el cierre, con un número ínfimo de viviendas. Se trata de una limitación para los que favorecen el cierre. Esto es, al exigir que el voto sea por vivienda, se quiso evitar que una minoría de los propietarios de viviendas en una urbanización impusieran su voluntad sobre el resto. Esta interpretación es la más lógica y razonable que puede hacerse de la referida disposición legal. Residentes Sagrado Corazón v. Arsuaga, supra, a la pág. 315.*

Por ende, al requerir la ley la participación de un solo propietario por vivienda, la autorización de la Sra. Viviane Cósimi

era suficiente para actuar en representación de tal inmueble. El tercer error tampoco fue cometido.

Ahora bien, habiendo determinado, al igual que el foro recurrido, que la parte apelante se obligó válidamente al pago de las cuotas de mantenimiento, nos corresponde dilucidar si existe una controversia sobre la legalidad de la totalidad de la deuda reclamada, y si parte de la deuda está prescrita.[14]

El Tribunal de Primera Instancia condenó a la parte apelante a satisfacer las siguientes cantidades, a saber: $30,521.49 en concepto de cuotas de mantenimiento, intereses y cargos por demora; (2) $6,301.04 a la cuenta número 107307 (P); (3) la cuantía acumulada a base de $178.00 mensuales desde el 30 de noviembre de 2021 hasta la fecha en que se emitió la "Sentencia"; y (4) costas e interés legal vigente hasta el pago de la deuda.

La parte apelante sostiene que la prueba estipulada, específicamente el Reglamento de UNDARE (Reglamento), controvirtió la presunción de legalidad del monto reclamado. Sobre esto, indica que, de conformidad con el Art. 7 del Reglamento, hay una porción de la deuda que no fue fijada conforme a la Ley. El antedicho artículo lee como sigue:

> *Artículo 7: Reuniones de la Asamblea de Miembros*
>
> *Sección 1: La Asamblea de Miembros se reunirá, **por lo menos**, una vez cada dos (2) años, en sesión ordinaria, para aprobar presupuestos, gastos, cuentas, elegir los Directores y demás asuntos que se fijen en la convocatoria. También se reunirá en sesiones extraordinarias.*

(Énfasis suplido).

Sostiene que UNDARE está incumpliendo con la Sección 11 (b) de la Ley Núm. 21 de 20 de mayo de 1987, *supra*, la cual

---

[14] Aunque la parte apelada sostiene que los últimos dos señalamientos de error (legalidad de la deuda reclamada, y si la deuda está prescrita), son argumentos que no fueron presentados ante el Tribunal de Primera Instancia, lo cierto es que, en su "Moción Solicitando Reconsideración; Enmienda a las Determinaciones de Hecho y Determinaciones Adicionales", la parte apelante trajo ambos planteamientos ante la consideración del foro primario. Véase, AP. a las págs. 707 y 708.

establece que, "[l]a cantidad proporcional con que debe contribuir cada uno de dichos propietarios a los gastos señalados se determinará, fijará e impondrá **al principio de cada año** calendario o fiscal y vencerá y será pagadera en plazos mensuales". (Énfasis nuestro).

Así, argumenta que existe una controversia, no tan solo sobre la cantidad reclamada en concepto de cuotas de mantenimiento, sino también en el pago ordenado por intereses. Lo anterior, puesto que la Sección 11 (b) de la Ley Núm. 21 de 20 de mayo de 1987, *supra*, solo dispone que "el cobro de una penalidad de hasta diez por ciento (10%) de lo adeudado".

Debemos mencionar que, el Reglamento de UNDARE, por sí solo, no establece una controversia sobre la cantidad de la deuda. Esto, toda vez que el mismo provee que la Asamblea de Miembros se reunirá, **por lo menos**, una vez cada dos (2) años. **La parte apelante no sustentó mediante evidencia alguna que la Asamblea de Miembros no se estaba reuniendo anualmente**. Incluso, a pesar de que UNDARE propuso, como hecho incontrovertido, que la parte apelante le debía las cantidades concedidas por el foro primario,[15] esta última, en su oposición, **se limitó a aseverar que este hecho estaba en controversia, sin refutarlo mediante evidencia sustancial**.[16] **Ni tan siquiera hizo referencia al Reglamento de UNDARE**.

En cuanto a los intereses, la parte apelante argumenta que "el Honorable Tribunal ha ordenado el pago de unos intereses y cargos que no son permitidos por la Ley". A pesar de ello, **tampoco presenta evidencia alguna sobre este aspecto**. En cambio, la parte apelada acompañó con su "Moción Solicitando Sentencia Sumaria" una declaración jurada de la señora Dora E.

---

[15] Véase, Ap. a la pág. 424.
[16] Véase, Ap. a la pág. 575.

Fernández Padilla, administradora de UNDARE, donde declaró que el balance adeudado en cuotas de mantenimiento equivale a $30,521.49 de principal, **intereses** y recargos por las cuotas de mantenimiento. La parte apelante falló en **refutar este hecho mediante evidencia sustancial** y, al no poner al foro recurrido en posición para determinar la existencia de una controversia sobre la deuda reclamada, el cuarto error no fue cometido. La parte apelante tuvo plena oportunidad de defenderse y presentar prueba a su favor, pero no logró controvertir la evidencia documental presentada por la parte apelada.

Finalmente, en su último señalamiento de error, la parte apelante sostiene que, el foro *a quo* dispuso de su defensa de prescripción sin mediar justificación alguna. Argumenta que, desde el año **2007**, la parte apelada "no hizo absolutamente nada con sus derechos y no es hasta **once (11) años** más tarde, que la parte Apelada aparece a reclamar el pago de las alegadas deudas". (Énfasis nuestro).

Según surge de las propias determinaciones realizadas por el foro primario,[17] y de la "Moción para que se Dicte Sentencia Sumaria" presentada por la parte apelada,[18] no fue hasta el **10 de septiembre de 2018** que UNDARE le envió a la Sra. Viviane Cósimi una carta de cobro solicitando el pago de las cuotas vencidas al 1 de agosto del 2018.[19]

**Los pagos de las cuotas de mantenimiento, por efectuarse en plazos breves, es decir, mensuales, están sujetos al término quinquenal dispuesto en el Art. 1866 del Código Civil,** *supra.* **No se trata de una obligación única que ha sido fraccionada, sino de una sucesión de prestaciones separables. Esto implica que, UNDARE solo tiene derecho a reclamar por**

---

[17] Véase, Ap. a la pág. 685, determinación de hechos número 42

[18] Véase, Ap. a la pág. 424, hecho número 56.

[19] Dicha misiva está fechada el 27 de agosto de 2018, e indica de forma expresa que se están **iniciando** las gestiones de cobro.

**vía judicial el pago de las cuotas vencidas, desde los 5 años anteriores al momento en que requirió el pago. Es decir, desde el mes de septiembre de 2013 en adelante**. **Las cantidades reclamadas con anterioridad a esta fecha ya están prescritas**. En vista de lo anterior, procede devolver el caso al Tribunal de Primera Instancia, con el propósito de que la parte apelada presente evidencia de las cuotas que, a partir del mes de septiembre de 2013, se cobraron y no se le pagaron. Una vez se haya satisfecho esta exigencia, el foro recurrido ordenará a la parte apelante a satisfacer el pago de dicha cantidad.

**IV.**

Por los fundamentos expuestos, se modifica la "Sentencia" emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan, a los fines de que UNDARE solo tiene derecho a reclamar por vía judicial el pago de las cuotas vencidas, desde los 5 años anteriores al momento en que requirió el pago. Así modificada, se confirma y se devuelve el caso al foro recurrido, con el fin de que UNDARE pueda evidenciar las cuotas que, a partir del mes de septiembre de 2013, se cobraron y no se le pagaron.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones